## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **TANYA NICOLE SLIMICK,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-01011** |
| | ) | **Judge Trauger / Frensley** |
| **STANLEY DICKERSON, Warden** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

In January 2014, a jury convicted Petitioner Tanya Nicole Slimick of one count of first-degree premeditated murder. *State v. Slimick*, No. M2014-00747-CCA-R3-CD, 2015 WL 9244888, at *1 (Tenn. Crim. App. Dec. 17, 2015), *perm. appeal denied*, (Tenn. Apr. 6, 2016). Slimick was sentenced to life imprisonment. *Id.* Having sought relief in state courts, Slimick has filed an amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. Docket No. 12. In her petition, Slimick argues that she received ineffective assistance of counsel at all stages and that the jury instructions provided during her trial were constitutionally deficient. *Id.* She has also requested that this Court grant her an evidentiary hearing should this Court determine the need for further factual development. *Id.* at 1.

For the reasons that follow, the Court will recommend that Slimick's petition be **DENIED**. Further, the undersigned recommends that Slimick's request for an evidentiary hearing be **DENIED**.

### I.    BACKGROUND

The Tennessee Court of Criminal Appeals ("TCCA") summarized the factual background of the case as follows:

At the time of the shooting on September 21, 2010, the defendant and the victim, Bryan Bell, had been in a romantic relationship for approximately seven years. The two began dating when they both worked at a T.G.I. Fridays near Pittsburgh, Pennsylvania, where the victim was also attending culinary school. The relationship had not been without turmoil, however. Edward Lenkiewicz, the victim's friend who worked with both the victim and the defendant in Pittsburgh, testified that the relationship was frequently rocky and tense, with the two "whisper fighting" in front of acquaintances.

Around 2006 or 2007, Selena Sancreek, a close childhood friend of the victim's, convinced the victim to move to the Nashville area. Ms. Sancreek had been renting a room in the Brentwood home of Billy Pirtle, and she arranged for the victim to take her room as she was vacating it. The victim moved to Brentwood and began to work as a cook at a nearby T.G.I. Fridays, while the defendant remained near Pittsburgh. At the time of the shooting, the defendant was living with her parents.

In Brentwood, the victim prospered socially and professionally. Shortly before his death, he was promoted to kitchen manager. He socialized with his roommates, Billy Pirtle and Justin Sowders, and with acquaintances from work. Around the end of July or early August 2010, the victim began a romantic relationship with Jennifer Earl, a server at the restaurant where he worked. The victim hid this relationship from Ms. Sancreek and others because managers were not permitted to date servers. At trial, Ms. Sancreek acknowledged having told detectives that she believed the victim would be loyal to one girlfriend.

The victim's father, Ms. Sancreek, Mr. Lenkiewicz, Ms. Earl, and the victim's roommates testified that he was friendly, easy-going, generous, and likeable. They testified that they had never seen him behave in a violent or aggressive manner. Mr. Lenkiewicz and Steven Slattery, who was the victim's supervisor prior to the victim's promotion, both testified that the victim did not act angry or aggressive even under stress at work. Witnesses testified that he always had a smile on his face. The victim's friends and family all testified that he always wore glasses except when sleeping, showering, or swimming and that he could not see without his glasses.

Although the victim and the defendant had been romantically involved for seven years at the time of the shooting, the victim apparently hid the duration and seriousness of his relationship with the defendant from his family, who lived in Ohio, and from his close friends. The victim's father recalled seeing the defendant once, prior to the victim's move, when they both attended a musical performance the victim was giving in a tavern in Ohio; the victim's father was not introduced to the defendant. Ms. Sancreek likewise only met the defendant once, in a group setting.

From the time of his move to the Nashville area, the victim's family and friends all believed that the victim was no longer dating the defendant. Mr. Lenkiewicz testified that the victim visited the Pittsburgh area once after his move but went to

great lengths to keep his visit a secret from the defendant, going so far as to sit for forty-five minutes in his car in order to avoid a mutual acquaintance he feared might reveal his visit. Another time, the victim asked Mr. Lenkiewicz not to tell the defendant that he was visiting the victim in Brentwood to attend a music festival, but the defendant found out and came uninvited. Ms. Sancreek and the victim's father both testified that they believed the victim and defendant had broken up prior to the move. The victim's new roommates and local acquaintances also all believed that the defendant was nothing more than a distant ex-girlfriend. None of the victim's friends or family were aware that he and the defendant had taken numerous trips together, that he had taken a road trip in August 2010 to visit the defendant in Pittsburgh, that he was sexually involved with the defendant, or that he was constantly in contact with her by telephone and text messaging. At trial, defense counsel gave the victim's father a ring which had been in the defendant's possession. The victim's father testified that the ring was cherished and valued by the victim and that the family had not known what had happened to it. Shortly after the shooting, Ms. Sancreek, unaware of the nature of the victim and defendant's relationship, told detectives that she would have known if the victim had been in a long-term relationship with the defendant.

Despite the victim's representations to his family and friends, the evidence at trial showed that the victim and the defendant were in a serious and intimate relationship, both before and after the victim's move to Nashville. Rachel Seifert, the defendant's supervisor at the T.G.I. Fridays in Pittsburgh, testified that the defendant quit her job in August 2009. Prior to that, the defendant had several times given notice that she was quitting to move to Tennessee. These planned moves always fell through. Telephone records, extending back into May 2010, show that the two were in daily contact, sending numerous text messages back and forth throughout this time and making numerous daily telephone calls. Although the defendant contacted the victim more often than the victim contacted the defendant, the calls and messages came from both parties. For example, on the first day that records were available, May 1, 2010, the defendant called the victim eleven times and sent him twenty-six text messages; the victim called her five times and sent her twenty-four text messages. Detective Jim Colvin testified for the State that the victim and defendant constantly communicated, and he gave August 20, 2010, as one example of the communications between the two; on that day, the defendant sent the victim thirty-eight text messages and called him thirteen times; the victim sent the defendant eighteen text messages and called her three times.

In April 2010, the victim made reservations for the defendant at an extended stay motel near his home. Medical records show that the defendant was treated in Williamson County on April 26, 2010, for a urinary tract infection. The victim again made reservations for the defendant to stay at the motel beginning on May 1, 2010; she sought medical treatment in Williamson County on that day and was diagnosed with thrush. Telephone records indicate that the cellular telephones of the defendant and victim were in close proximity to each other and to the motel on numerous days between May 2 and May 17, 2010.

On May 16, 2010, the victim's telephone sent a series of threatening text messages to the defendant's telephone. The prosecution attempted to imply that the defendant obtained the victim's telephone and sent the messages to herself. Prior to these text messages, on August 18, 2009, the defendant had purchased a Smith & Wesson handgun at a store in Pennsylvania. The defendant also purchased pink handgrips for the gun as an accessory, and the victim's text messages reference the defendant's "pink thing." The defendant purchased a stun gun from the same store on December 21, 2009. The defendant apparently saved the threatening text messages onto her telephone, and on July 15, 2010, she forwarded some of them to her email. Cellular records show that the victim placed a call at 10:35 a.m. on May 16, 2010, and that the victim's telephone used a cellular tower near the motel where the defendant was staying. The series of threatening text messages begins at 11:27 a.m. The following text messages were sent from the victim's telephone to the defendant's telephone between 11:27 a.m. and 11:53 a.m. on May 16, 2010:

"You will get it tomo[r]row at your house"

"yes I proMise im moving"

> "Stop. cause if you dont s\*ck me in your parents room, then i will kill you with your pink thing. now stop you know we are not to discus this on the phone. keep acting like this and I will kill your parents too infront of you"

> "Cause im f\* \*ked up. i do lpve you. just please listen to me and everything will be fine. i am sory baby"

> "Yes if i had too. stop talking about this now or taz[1] is next. and erase all these texts now"

"Ok. just know that i still have frends in pitt who can help me dothings. so you never know what can happen. now stop. iM done talking"

Records show that the defendant's telephone was also sending text messages to the victim's telephone in between these messages, but the bulk of the defendant's responses were not preserved. Her telephone preserved one sent message asking "then why cant i have my pink now?" This message was in response to the victim's text message promising to move. At 3:58 p.m., the victim placed a telephone call which used a cellular tower near the motel.

In early June of 2010, the victim again made reservations for the defendant to stay at the motel near his home. Ms. Sancreek testified that the victim told her that the defendant was in town in June and again sometime around August. The victim seemed frustrated because the defendant "seemed to pop up" when he had other plans or work.

---

[1] Taz was the name of the defendant's small dog.

The victim's roommates knew the defendant by sight because there were two or three occasions when the defendant arrived in town while the victim was not at home and sat in her car in the parking lot, awaiting the victim's return. Ms. Sancreek also saw the defendant sitting in the victim's parking lot one time. In late June or early July, Mr. Sowders saw the defendant sitting in her car, and Mr. Pirtle decided to invite her into the home. Mr. Pirtle's impression was that the defendant was extremely shy and very fragile. The defendant told the roommates that she had packed all of her possessions because she and the victim were leaving to get married and to move to California the following day. Mr. Pirtle knew that the victim did not intend to move. The victim's extremely cluttered room was not at all packed, the victim had just been promoted, and he seemed happy with his life in Brentwood. Mr. Pirtle tried to delicately let the defendant know that the victim did not appear to intend to move. Mr. Sowders testified that the defendant also told the roommates that the victim had been on his way to visit her on New Year's Eve when his car was in an accident in Kentucky, and he was put into jail. Mr. Sowders knew that the victim's vehicle had never been in an accident. Mr. Sowders acknowledged that he had told police that he thought the victim was making up the accident as an excuse not to visit the defendant. When the roommates told the victim about the defendant's implausible stories, the victim said he would "handle this" and that "some of it might be [his] fault."

Telephone records reveal that between July 7 and July 11, 2010, there were no text messages or calls exchanged between the two. After the shooting, Detective Jim Colvin found two crumpled pages of a letter apparently written by the defendant to the victim in a trash can in the victim's room. The pages were underneath food trash with a July 5, 2010 receipt. Helping to organize the victim's possessions after his death, Mr. Pirtle found one more page of the handwritten letter. Ms. Sancreek believed that the letter was written in June or July. The letter from the defendant to the victim begins,

> I don't even know what to say anymore. You're a horrible person. And the best liar I know. I gave up my life for you. You kept promising me everything. How could you be so cruel to me? How could you be so cruel to anyone? It's not human how you treated me. And you swore on your family and your mother's cancer! I mean who does that? If you didn't want me 4 years ago, then why string me along and do this to me?

The defendant details her feelings of hurt and betrayal, her extreme investment in the seven-year relationship, and her belief that the victim has deceived her and lied to her. She calls the victim a monster. The letter does not refer to the victim behaving violently toward the defendant. However, she ends the letter by telling him, "Think about my love for you. If you do want to rekindle us then don't be afraid to ask me." Detective Colvin testified that he found what appeared to be a draft of this letter in the defendant's papers which she had brought to the victim's home just prior to the murder. The draft ends by telling the victim that the defendant will never take him back. The draft also contains the following sentences, marked

through to signify deletion: "I could hurt you if I really wanted cause I have a lie that I kept a secret for a long time. Actually, I have 3 lies I've told you. No 4 lies."

Despite the rupture, the defendant and victim resumed their relationship. On July 12, 2010, the defendant sent seven text messages to the victim and called him six times. The victim called the defendant once. On July 20, 2010, the victim ordered black high-heeled shoes with heels fashioned to resemble gun barrels to be delivered to the defendant. On August 8, 2010, he checked on the order status because it had not been delivered.

On August 12, 2010, the victim took a road trip to visit the defendant in Pennsylvania. Pictures recovered from the victim's telephone document his drive to see the defendant. The victim apparently sent these pictures to the defendant as he traversed the interstate; he also sent intimate pictures of his unclothed body. Cellular telephone records establish that the telephones of the victim and defendant were in close proximity to a hotel in Pennsylvania on August 12, 2010.

Although the defendant had previously discovered from the victim's roommates that the victim did not intend to move, the victim emailed her a picture of a moving truck on August 24, 2010. A search of the victim's computer revealed that the victim performed several internet searches for moving trucks and that the image was simply a photograph he had found on the internet.

On September 10, 2010, the victim sent the defendant a picture of his clothed crotch and several images taken on the interstate. The defendant's expert in computer forensics determined, however, that at least one of these photographs was taken from a southbound location on Interstate 65 near the victim's home and was not from a long-distance road trip to see the defendant. At approximately 6:09 p.m. on September 10, 2010, the defendant began to call the victim. The defendant placed approximately three hundred and fifty calls in a row to the victim's number, continuing to call over the next two days; the victim finally called the defendant on September 12th. The victim's telephone contained intimate pictures that he sent to Ms. Earl around the time he was receiving the numerous calls from the defendant.

At some point, the defendant discovered that the victim was also in frequent contact with his new girlfriend, Ms. Earl. The defendant's reaction was to track the calls and to attempt to contact Ms. Earl. Among the defendant's journals found in her luggage, Detective Colvin found a paper tracking various numbers called by the victim. Calls between Ms. Earl's number and the victim's number were counted with tally marks beginning on September 14, 2010. On that same day, Ms. Earl was out of town on vacation when she received a call from the defendant. The defendant had dialed "*67" to restrict the origin of the call. Ms. Earl did not answer the call. The defendant's papers also contained two drafts of a text message to Ms. Earl, who the defendant apparently believed was called "Bridgette." The draft begins "hi, B, this is T," and admonishes the recipient that the "obsessive texting" is affecting the relationship between the victim and defendant.

Despite her discovery that the victim might be involved with another woman, the defendant came to visit the victim on the weekend of September 19, 2010, with the apparent understanding that they would move in together shortly.

On Sunday, September 19th, the victim and Ms. Earl attended a football game downtown around noon. While the victim was out on this date with his new girlfriend, the defendant arrived in Brentwood. Ms. Earl testified that the victim's telephone kept "going off" during the game but that he assured Ms. Earl that everything was fine.

Shortly after 5:00 p.m.,[2] the defendant, who had placed six unanswered calls to the victim, called Ms. Earl four times, dialing " *67" to block her telephone number. She also placed one restricted call to the victim's work. These calls originated using a cellular telephone tower near the victim's residence. Ms. Earl did not answer the first two calls, but the victim urged her to answer the third. The defendant asked Ms. Earl if she was "Bridgette" and asked to speak to the victim. Ms. Earl was startled because she and the victim had kept their relationship a secret due to restrictions at work. The defendant called again, and the victim talked to the defendant in Ms. Earl's yard. Ms. Earl and the victim went out to eat. The victim told her that the defendant was his ex-girlfriend and that their relationship had been "hideous."

On the Sunday of the defendant's arrival, Mr. Pirtle was out of town on vacation, and Mr. Sowders was preparing to leave on an early morning flight the next day. At around 6:30 p.m., on Sunday, Mr. Sowders returned home from work and saw the defendant's Jeep in the parking lot. She was in the vehicle with the seat reclined. Mr. Sowders decided not to invite her in, but he went into the house and sent a text message to the victim. He received no response. Prior to going to sleep around 11:00 or 12:00 that evening, Mr. Sowders looked out the window and saw that the defendant was still sitting in her car. The doors of the residence were, according to the roommates' custom, unlocked. When Mr. Sowders woke the next morning, he went to shower in the bathroom next to the victim's bedroom. The victim's bedroom door was cracked as usual to allow his cat access to the litter box. When Mr. Sowders left the bathroom, the victim's bedroom door was completely closed and the defendant's car was empty in the parking lot. The victim was not home. Ms. Earl testified that the victim stayed at her house that night and left around 7:30 a.m. to go to work.

Ms. Sancreek and Mr. Slattery worked with the victim at the restaurant the following day, September 20, 2010. Ms. Sancreek took out some trash around 3:30 or 4:00 p.m., and she overheard the victim speaking on the telephone on the back loading dock. The victim was saying "that they were friends," and he said, "move on with your life[;] I'm here for you, but I'm seeing somebody." Mr. Slattery saw the victim on the back loading dock with his telephone out around 7:00 or 8:00 p.m. that night. The victim told Mr. Slattery that "that crazy b* * *h is back in town."

[2] Testimony at trial indicated that the times of telephone calls were incorrect in certain exhibits because the times reflected Eastern rather than Central time.

The victim and defendant exchanged a number of text messages that day. At the same time, the victim was also sending text messages to Ms. Earl regarding his happiness in their relationship. Detective Colvin acknowledged that a preservation letter was not sent to Verizon immediately after the defendant's arrest; thus, only the text messages that had been saved on the defendant's and victim's telephones were recovered. Some of the victim's responses to the defendant apparently had to do with his relationship with Ms. Earl. For instance he sent her a text message that read, "My girlfriend." He then responded to a question with, "no. but i told her i thought it was excesive that i was being tracked and my calls being monitored and traced."

At around 8:00 p.m. that evening, the victim and defendant exchanged the following series of text messages:

> Defendant: baby im cold. i need ur body. r u on ur way?

> Victim: on my last project.

> ....

> Defendant: can u still f* *k me? plz. ill wear the shoes

> Victim: Ok

> Defendant: did u really try to get an aptmnt friday?

> Victim: Yes. all day

> Defendant: r u still gonna get us a place? u help ur friends and im ur friend?

> Defendant: so ur still getting a truck on tues?

> Victim: thats the plan

> Defendant: i know its the plan. r u really gonna do it?

> Victim: probably

> Defendant: then why did u cancel the hotel?

> Victim: cause i found out my roommates were both going to be oit of town

The defendant then drafted, but did not send, several text messages regarding Ms. Earl to the victim, including, "is she gonna help u kill me," "why did u tell me not to come yesterday," and one message asking the victim whether he would impose on her by continuing their sexual relationship while hiding some infidelity. Instead, the defendant sent the victim a text message asking about food. She then sent him, three times, a text message asking, "why did u say we need to talk? and why didnt u say u love me? but u plan on moving?" She sent a final text urging him to respond

to this question. Ms. Sancreek testified that the victim left work after 9:00 p.m., taking a to-go order of food that appeared to be for more than one person.

At 3:39 a.m., the defendant placed a call to her parents which lasted for two minutes and fifty-four seconds. At 3:42 a.m., the defendant called 911. After the defendant informed the operator of her location, the following exchange took place:

> Defendant: My boyfriend tried to kill me.
>
> Operator: What did he do?
>
> Defendant: He ... he stole my gun from my house like a long time ago and he, he....
>
> Operator: He what? Ma'am, just calm down and talk to me, OK? Is he still there?
>
> Defendant: Yeah, I think he's dead....We were struggling with the gun, and he told me he was going to kill my parents, so I shot him.

The defendant was crying throughout the call, and she told the operator that she was going to pass out. The call was disconnected, and the operator called back. When asked if the victim was breathing, the defendant sobbed that she did not want to touch him. The defendant was unable to tell the operator where the gun was or how many times she fired the weapon. The defendant also told the operator, "I shouldn't have come down here." Officers arrived on the scene, and the defendant was taken into custody.

The parties stipulated that the pink-handled gun had fired all four bullets which were shot. Witnesses agreed that there was one bullet remaining in the weapon and that no one had attempted to fire this bullet. Beyond that, the State attempted to show that the physical evidence supported premeditation, whereas the defendant attempted to establish that the physical evidence showed that she was acting in self-defense.

Officer Christopher Woodard arrived on the scene and saw the defendant, wearing a black tank top and pants, lying on her back on the living room floor next to a telephone. The defendant was barefoot, and Officer Woodard saw dried blood on the bottoms of her feet. She appeared dazed and offered no resistance. The victim was lying face-down in the hallway outside his bedroom, with the upper part of his body in the bathroom, clothed only in a black T-shirt. He appeared deceased, and there were large amounts of blood in the hallway and bedroom. Initially, the defendant could not tell officers where the gun was located, but she finally answered that she had thrown it into the bedroom. In the bedroom, Officer Woodard pulled the comforter back from the bed to make sure no one was underneath. He found a knife lying under the comforter. Officer Woodard acknowledged that his report said that he saw signs of a struggle in the bedroom and that he did not mention moving the comforter in his report.

Sean Bardo, a paramedic, found the victim deceased with a large gunshot wound in the center of his back. Mr. Bardo testified that there was a lot of blood and that some of the blood was wet and some was dry. The victim was cool to the touch. Mr. Bardo could not answer whether these observations indicated a passage of time since the injury. In examining the gunshot wound to the victim's back, Mr. Bardo lifted the victim's shirt briefly. Mr. Bardo did not examine the defendant, although he testified that fainting would be considered a medical emergency.

Dr. Bridget Eutenier, the medical examiner, testified that the victim died of multiple gunshot wounds. The autopsy revealed that he had been shot four times and that two of the bullets had exited his body. The victim was shot once at the base of the neck, with the bullet traveling front to back, left to right, and in a downward trajectory. This bullet was recovered from the victim's body. He was also shot in the right hip, with the bullet entering from the front of his body and exiting in the back and traveling essentially level but slightly downward. There was a superficial bullet wound to his back on the upper left shoulder, with the bullet traveling left to right and slightly upward and exiting near the entrance wound. The victim suffered a fourth gunshot wound in his back. The bullet traveled back to front and left to right and was recovered during the autopsy. The medical examiner testified that the neck wound would be most likely to bleed in an arterial pattern, with blood flow increasing each time the heart pumped. The medical examiner testified that the downward angle of the neck wound could have been created if the victim were bending over or if the shooter were elevated.

Special Agent Alex Brodhag, a firearms examiner, testified that he examined the victim's shirt and found six holes. He could not determine the range from which the bullet that entered at the base of the victim's neck or the bullet that pierced the victim's back shoulder was fired. However, Agent Brodhag was able to determine that the bullet causing the hip wound was fired less than four feet from the victim, and the bullet from the wound to the back was fired between three and thirty-six inches from the victim and most resembled the pattern of a shot fired twelve inches away.

In addition to the fatal gunshot wounds, the victim suffered blunt force injuries to his head. There were lacerations and tears on his left ear, and there were lacerations and contusions predominantly on the back left side of his head. There were also two small abrasions on his face. The medical examiner agreed that these abrasions could be consistent with the prongs of a stun gun. The medical examiner found at least seven impact sites on the victim's head.

Witnesses testified that the victim kept a very cluttered and messy room. Captain Richard Hickey agreed that it was difficult to determine if there was a struggle or if the room was just messy. An alarm clock which the victim's roommates and Ms. Earl had seen in working order was unplugged and turned to the wall, and a bottle of water on the nightstand was on its side. Nothing in the room appeared to be broken. The handgun was located under a woman's red and black shirt in the

victim's bedroom. It was covered in blood except on the handles. Between the mattress and box spring were some pieces of women's lingerie.

The victim's glasses were found on the nightstand in the bedroom.

The defendant's cellular telephone, which did not appear to have blood on it, was found in the dining room next to the defendant. The victim's cellular telephone was covered in blood and appeared to have been moved, because it was found on a desk surrounded by items that did not have blood on them.

Johnny Lawrence, an expert in crime scene analysis and blood spatter, examined the photographs and videos of the crime scene. He testified that he believed the first shot caused the victim's neck wound and that it was fired while the victim was between the bed and the dresser near the head of the bed. He acknowledged that the bullet trajectory in the victim's neck was consistent with him bending over and reaching for the defendant. He testified the blood evidence and bullet trajectory were also consistent with the victim being on his knees. He testified that he believed the second shot was the one that injured the victim's hip and that it was fired from the area near or on the bed. He determined that this shot was fired while the bedroom door was partially closed because the bullet was recovered from the closet door, which would have been obscured if the bedroom door had been open. The bullet entered the closet door approximately two feet above the ground. Mr. Lawrence found no blood on the inner door knob, leading him to believe that the door was then opened without use of the handle. While the bedroom door was open, a third shot was fired. Mr. Lawrence testified that this shot would have caused the victim's shoulder wound. The third bullet pierced the bedroom door and was recovered from the wall behind it. The bullet was traveling upward and entered the door sixty-nine inches from the ground. Both bullets recovered from the bedroom tested positive for the victim's DNA.

There were blood stains on the door from the victim leaving the room, and there were arterial spurts on the hallway wall. Mr. Lawrence believed that the victim was probably not standing at this point. Mr. Lawrence testified that the final shot struck the victim's back. This shot was fired while the victim lay face-down in a position close to that in which his body came to rest. Mr. Lawrence was able to make this determination because the blood flow from the wound was toward the side and not toward the feet. He also testified that the hole in the victim's shirt was aligned with the wound. Mr. Lawrence was not aware that Mr. Bardo had testified that he lifted the victim's shirt as he attempted to administer first aid.

Mr. Lawrence was not able to determine if the blunt force injuries to the head were administered in the bedroom or hallway. He did not see any cast-off stains as he would have expected. He testified that the few blood drips in the dining room would not have come from the victim because there was not enough blood. According to Mr. Lawrence, the victim's bloody telephone had been moved because its surroundings were not bloody, but the telephone had blood stains from a finger swiping across the glass. Mr. Lawrence also testified that the defendant did not have

a large amount of blood on her person and that he would have expected to see the same type of stains on her as on the bed and floor.

Mr. Lawrence testified that a small room might have been filled with smoke and that a "concussion effect" could have obscured the sound of multiple gunshots. Accordingly, he acknowledged that it was possible that the defendant would not know how many times she had fired, how many times the victim was hit, or whether the victim still presented a threat. He acknowledged that a person who had been assaulted and then was grabbed by the assaulter might become scared and fire a final shot.

Mr. Lawrence testified that the knife in the bed was placed there after the victim had left the bed. Detective Colvin also testified that the knife in the bed was laid on top of and partially obscuring some drops of blood. Detective Colvin testified that some of the blood drops under the knife did not transfer onto the knife, indicating that they could have been dry prior to the knife being placed in the bed.

Near the victim's body, police found the battery cover for a "saber" two-prong stun gun. The stun gun itself was set on top of one of the defendant's pieces of luggage, with the battery cover missing. DNA testing revealed that DNA on the probes matched the victim's DNA. The victim's blood was also recovered from the handle of the stun gun. Lying on the floor in the bedroom was a second stun gun. The boxes which were apparently the packaging for these stun guns were found in the defendant's luggage, and they did not appear to have any tears or blood on them. The "saber" stun gun had Duracell batteries, and the defendant's luggage contained packages of Duracell and Energizer batteries. The defendant's luggage also contained pepper spray and three latex gloves, as well as numerous journals and personal papers. One of these papers contained one-line descriptions of sex acts, which Detective Colvin testified were consistent with "phone sex." Also on top of the luggage were the shoes that the victim had ordered for the defendant in July. Captain Hickey acknowledged that he did not collect these shoes.

The knife found on the bed appeared to have been taken from a set of kitchen knives kept on a magnetic strip by the stove. The knife itself had little blood on it, although it was lying on a sheet with numerous blood stains. The victim's blood was found on the knife blade. The handle of the knife had a weak positive result for blood. Testing showed that DNA from the handle came from two or more individuals, including the victim and another unidentified male. Mr. Sowders testified that this knife belonged to him and that he used the knife daily.

In the dining room, police recovered what appeared to be the victim's canvas sneakers. The sneakers were neatly lined up near where the defendant was found, and the victim's blood was found inside the shoes. Mr. Lawrence testified that the blood inside the victim's sneakers had been transferred there by something coming into contact with the shoes.

Detective Amy Cole photographed the defendant to document evidence and injuries. On September 21, 2010, she documented blood on the defendant's feet and

legs, and she photographed blood marks which were consistent with bloody fingertips swiping the defendant's legs. These marks were underneath the legs of the defendant's pants. Mr. Lawrence testified that these marks were consistent with the victim reaching for and grabbing the defendant. There were red marks on the defendant's chest and bruises on her arms that appeared older. Detective Colvin also saw a scratch on her neck. The defendant's nails were not broken. Her hands were clean, but there was dried blood under her nails. The defendant's fingernails from her left hand were collected, and they tested positive for the victim's DNA. Officers testified that the defendant had not been permitted to wash her hands after they arrived on the scene, but her hands were not bloody except under the nails. The victim's blood was also on the defendant's tank top, pants and underwear. Testing on the victim's fingernails yielded the victim's DNA, along with a minor contributor who could not be identified.

On September 24, 2010, the defendant was again photographed. There were five large bruises on her thighs and on her shins that had developed since photographs taken the day of the crime. Mr. Lawrence testified that he had seen assault victims sustain bruising similar to the defendant's.

The defendant's doctor, Andrew DeMarco, testified that he had been treating the defendant since 1999 and that she suffered from anxiety. In 2009, the defendant complained that she had gained twenty to thirty pounds in one year, and Dr. DeMarco concluded that the cause was anxiety. The defendant's anxiety also induced fainting spells. In September 2010, the defendant had fainted and hit her head, and her parents took her to the emergency room and then to Dr. DeMarco. Dr. DeMarco testified that the feeling of an incipient fainting spell is "an unmistakable sensation" and that he had advised the defendant to lie down flat on her back, in the position she was found in by police, if she felt she was going to faint. He also testified that fainting would often result in a loss of memory which would extend backwards from the time the patient fainted and also would extend forward from the time the patient revived. Events occurring in that time could be confused or would not be remembered. Dr. DeMarco testified that the defendant did not tell him she was in an abusive relationship; however, he testified that her parents generally, although not always, were present for her appointments.

After the defendant was incarcerated, she made a telephone call to her mother. Despite her mother's warning not to say anything on the telephone, the defendant told her mother to get items from a canvas bin in her bedroom and "give it to Daddy—you know what Daddy does—give it to Daddy to do that this morning." She elaborated that she wanted her mother to give her father the items to "take down outside." Detective Colvin went to the defendant's parents' home. The defendant's possessions appeared unpacked. Detective Colvin found a burn barrel in the back of her home but was unable to determine whether evidence had been destroyed. There were several partially burned items in the barrel, including coupons. He also found a box of ammunition fitting the weapon, and there were five rounds missing. Detective Colvin acknowledged that it was possible that the defendant wanted the paper containing the list of sex acts destroyed and had forgotten that she packed it.

Detective Colvin testified that during the call to her mother, the defendant demonstrated a concern about what people would think of her and also a concern for the animals living at the victim's house. The defendant also spoke to her mother about canceling an appointment for a haircut.

The victim's roommates hired a company to clean the contaminated parts of the house after the homicide. The company took all of the victim's possessions that were salvageable and put them into bags. In sorting the victim's possessions, Mr. Pirtle found a holster which fit the firearm used to shoot the victim, and he found some paperwork regarding the weapon. He gave the holster and papers, along with the missing page of the defendant's July letter, to Mr. Sowders, who gave them to Detective Colvin. Captain Hickey acknowledged that he had not found the holster when he searched the room. The holster did not have any blood on it.

*State v. Slimick*, 2015 WL 9244888, at *1–10 (Tenn. Crim. App. Dec. 17, 2015).

### A.  Procedural History

#### 1.  Conviction and Sentencing

After her trial, a Williamson County jury convicted Slimick of one count of premeditated first-degree murder. *Id.* at *1. Slimick was sentenced to life imprisonment. *Id.*

#### 2.  Direct Appeal

Slimick timely appealed her conviction and sentence to the TCCA with the assistance of counsel. *Id.* The TCCA summarized the issues Slimick raised on appeal as follows:

> On appeal, the defendant challenges the sufficiency of the evidence, asserting that the State failed to show premeditation or to negate self-defense. She also raises numerous challenges to the jury instructions, including that the trial court instructed the jury that the defendant had the burden of raising the issue of self-defense; that the self-defense instruction was confusing to the jury; that the jury instructions improperly failed to list the negation of self-defense in the litany of items which the State is required to prove beyond a reasonable doubt; and that the instructions failed to list lesser included offenses whenever the "charged offense" was referenced. The defendant also asserts that there was reversible error in the use of a demonstrative aid in the prosecution's closing argument.

*Id.*

The TCCA affirmed Slimick's conviction and sentence. *Id.* Slimick then timely appealed to the Tennessee Supreme Court, which denied review. Docket No. 20-46.

### 3.  **State Post-Conviction Proceedings**

With the help of appointed counsel, Slimick filed a timely petition for post-conviction relief in November 2016. Docket No. 20-47, pp. 52-59. Slimick's claims for relief in that petition are as follows:

(a) **Denial of Effective Assistance of Counsel:** The Petitioner herein asserts that she was denied her constitutional right to the effective assistance of counsel for several reasons. Each of these reasons individually, the Petitioner avers, is sufficient for a finding of ineffective assistance. In the alternative, the Petitioner asserts that the deficiencies of trial counsel cumulatively resulted in ineffective assistance.

   (1) The Petitioner's conviction is invalid in light of the ineffective assistance of counsel in violation of the Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States by the specific errors and omission of her trial and appellate counsel, hereinafter referred to as "ineffective assistance of counsel."

   (2) The trial counsel rendered ineffective assistance of counsel by giving faulty advice when he advised Petitioner not to take the witness stand in her own defense. Because of this advice, the testimony of the state's witnesses stood unrebutted. Had the jury had an opportunity to hear from the Petitioner as to her side of the story, the outcome would probably have been different.

   (3) The trial counsel rendered ineffective assistance of counsel by giving faulty advice when he advised Petitioner's Mother and Father not to take the witness stand in their daughter's defense. Because of this advice, the proof did not establish the history of the relationship between the alleged victim and their daughter. Had the jury had an opportunity to hear from the Petitioner's parents as to their side of the story, the outcome would probably have been different.

   (4) The Constitution of the United States and the State of Tennessee requires a proper charge of the jury in all criminal cases. The trial court in this case did not properly charge the jury as to the state's burden to negate the affirmative defense of self-defense, thereby depriving the Petitioner of a fair trial.

*Id.* at 55–56.

Slimick filed an amended petition for post-conviction relief in January 2019. *Id.* at 74-81. The amended petition dropped all claims of ineffective assistance of counsel and added the following claims for relief:

**(a) Pursuant to Tenn. Code Ann. § 40-30-103:** The Petitioner herein asserts that she was denied her constitutional right to a fair trial under the Constitution of the State of Tennessee and of the United States, specifically in violation of her Fifth, Sixth and Fourteenth Amendment rights.

(1) The Constitution of the United States and the State of Tennessee requires a proper charge of the jury in all criminal cases. The trial court in this case did not properly charge the jury as to the state's burden to negate the affirmative defense of self-defense as set forth in Tenn. Code Ann. § 39-11-201(a), thereby depriving the Petitioner of a fair trial in contravention of her Fifth, Sixth and Fourteenth Amendment rights.

(2) The Constitution of the United States and the State of Tennessee requires a proper charge of the jury in all criminal cases. The trial Court's instructions on self-defense were erroneous by combining the "no duty to retreat" issue with the elements of self-defense. Further the Court failed to grant the Defendant's special jury instruction removing language which cast the burden on the defendant to "raise" the defense. Such violated the defendant's state and United States Constitutional rights under the Fifth, Sixth and Fourteenth Amendments.

(3) The failure to instruct the jury so as to give equal dignity to the lesser included offenses deprived the Petitioner of her right to a jury trial under the Fifth, Sixth and Fourteenth Amendments of both the Constitution of the State of Tennessee and the United States.

(4) The failure to charge the defendant's special request as to the elements of the offense and the negation of self-defense, the failure to charge the defendant's request that the burden is always on the State to negate self-defense and that there is no burden on the defendant to "raise" the defense as a jury question, and the failure to charge the requested manner of specifying lesser included offenses, in combination, deprived the Petitioner of her Fifth, Sixth and Fourteenth Amendment rights under the Constitution of the State of Tennessee and United States. It further violated the requirement that the State must bear the burden of proving the Petitioner guilty beyond a reasonable doubt.

(5) The violation of the trial Court's instructions regarding "social media contact" by the jurors requires a new trial and is in violation of the Petitioner's Sixth and Fourteenth Amendment rights per the State and Federal Constitution.

(6) The government engaged in prosecutorial misconduct by arguing to the jury that there were only "three" surgical gloves when in fac [sic] the prosecutor well knew that the fourth surgical glove had been seized by the police in the search of the Petitioner's residence in Pennsylvania. Such violated the Petitioner's Fifth, Sixth and Fourteenth Amendment rights of both the State and Federal Constitution and deprived the Petitioner of a fair trial.

(7) The government engaged in a highly improper argument by the use of two prosecutors moving about the courtroom during the State's rebuttal closing argument to "demonstrate" the State's theory about the nature of the shooting. Such violated the Petitioner's Fifth, Sixth and Fourteenth Amendment rights of both the State and Federal Constitution and deprived the Petitioner of a fair trial.

*Id.* at 78–79.

The State moved to dismiss the amended petition. Docket No. 20-48, pp. 93-98. After a hearing in February 2019, the post-conviction court granted the State's motion to dismiss and denied post-conviction relief without an evidentiary hearing. *Id.* at 242-43. Slimick then timely filed a notice of appeal of the post-conviction court's order denying her petition for post-conviction relief. *Id.* at 246. In her appeal before the TCCA, Slimick advanced several grievances related to juror and prosecutorial misconduct. *Slimick v. State*, No. M201900458CCAR3PC, 2020 WL 1280801, at *3, 4 (Tenn. Crim. App. Mar. 17, 2020). She also argued:

that the trial court failed to properly charge the jury regarding: (1) the State's burden to negate the affirmative defense of self-defense; (2) the separation of the "no duty to retreat" doctrine from the definition of self-defense; (3) the removal of prefatory language regarding the State's burden of proof concerning overcoming the Petitioner's claim of self-defense; and (4) that the charged lesser-included offenses "were as much part of the allegations as the 'charged' offense." Additionally, she claim[ed] that she [was] entitled to relief due to the cumulative error in the jury instructions.

*Id.* at 2.

The TCCA subsequently affirmed the post-conviction court's denial of Slimick's petition for relief. *Id.* at 1. Slimick appealed to the Tennessee Supreme Court, but her application for discretionary review was denied. Docket No 20-56.

### 4. **Federal Post-Conviction Proceedings**

Slimick initiated this action in November 2020 by filing a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. Docket No. 1. Slimick raised four grounds for relief in her initial pro se petition:

1. The jury instructions were infirm on numerous grounds violating the Petitioner's right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

2. The prosecutor's rebuttal summation was improper and violated the Petitioner's constitutional rights to a fair trial and Due Process under the Fifth, Sixth, and Fourteenth Amendments.

3. Trial and appellate counsel rendered ineffective assistance of counsel in violation [of the] Sixth Amendments to the United States Constitution at trial and on appeal.

4. Post-conviction counsel provided ineffective assistance of counsel causing waiver of important constitutional claims for relief from the infirm conviction.

Docket No. 1, pp. 6-11.

With the help of appointed counsel, Slimick filed an amended petition in July 2021. Docket No. 12. The amended petition dropped the claim of prosecutorial misconduct, and it incorporated six distinct claims for relief with multiple sub-claims that raise the total number of asserted claims to thirteen:

1. Post-conviction counsel failed to identify and develop and present forensic psychologist Dr. Samuel Schachner testimony to offer proof of trial counsel's deficient performance.

2. Post-conviction counsel failed to consult an expert in battered spouse syndrome and post-traumatic stress disorders or have Petitioner evaluated present expert testimony supporting the evidence that the Petitioner was a battered woman.

3. Post-conviction counsel failed to develop lay witness testimony of Petitioner's history of abuse by Bell.

4. Post-conviction counsel's appellate brief evidences they abandoned their responsibilities to the Petitioner.

5. Trial Counsel was constitutionally ineffective and the Claims of ineffective assistance of counsel are substantial and prejudicial.

    a. Trial Counsel's Assistance was Ineffective by Failing to Develop the Petitioner's Theory of Self-Defense at Trial.

        i. Trial Counsel failed to present the Petitioner's testimony despite his suggestions throughout trial that the Petitioner was going to testify and his advice to the Petitioner that she needed to testify to establish she acted in self-defense.

18

ii. Trial Counsel's failure to call forensic psychologist Samuel Schachner to offer proof of Petitioner's diminished capacity amounted to deficient performance of counsel.

iii. Trial Counsel failed to present expert testimony supporting his claims that the Petitioner was a battered woman.

iv. Trial counsel failed to take necessary steps to exclude unfair, prejudicial testimony pertaining to the Petitioner's offensive sexual acts with Mr. Bell.

b. Trial Counsel was Ineffective for Failing to Recommend that the Petitioner Accept the Plea Bargain Offer.

c. Trial Counsel Failed to Effectively Raise a Juror Misconduct Issue Relevant to Whether the Juror was fit to Render a Verdict.

i. [Trial counsel] haphazardly objected to the juror's violation of the Court order in [Slimick's] motion for new trial, failing to fully establish the issue at the hearing on the motion[.]

ii. [T]rial counsel waived the issue on appeal upon failing to raise it.

d. Trial counsel's errors both singularly and cumulatively prejudiced the Petitioner and warranted setting aside her conviction and sentence.

6. The Tennessee Court of Criminal Appeals decision denying the Petitioner's challenges to the infirm jury instructions is contrary to clearly established Supreme Court law.

Docket No. 12, pp. 21–42. In addition, Slimick incorporates by reference all claims raised in her initial pro se habeas petition (Docket No. 1). *Id.* at 2.

The State of Tennessee filed the state-court record (Docket No. 20) and answered the amended petition in May 2022 (Docket No. 21). The State argues that several claims for relief are barred because the amended petition was filed after the statute of limitations expired on March 15, 2021. Docket No. 21, pp. 1–2. The State acknowledges that new claims in an amended petition can relate back to the date of the original petition; however, the State argues that Claims 5(a)(ii)–(iv), 5(c)(i), and 5(d) do not relate back because those claims do not share a "common core of operative facts" with the original petition. *See id.* at 13–14 (quoting *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011) (citing *Mayle v. Felix*, 545 U.S. 640, 664 (2005))). As a result, the State

argues these claims are time barred. Docket No. 21, p. 14. The State concedes that Claims 5(a)(i), 5(b), and 5(c)(ii) do relate back to Slimick's initial petition; however, the State alleges that those claims are procedurally defaulted and otherwise meritless. *Id.* at 14–16. Additionally, the State avers that Claim 6 lacks merit under 28 U.S.C. § 2254(d). *Id.* at 23–30.

Slimick filed a reply in November 2022 (Docket No. 26), in which she maintains that she is entitled to relief on each of her claims. Slimick asserts that all of her claims relate back to her pro se petition and are timely because they "share a common core of operative facts with the pro se petition while clarifying and amplifying [them] with specificity." *Id.* at 2–3. Furthermore, Slimick maintains that all but two of her claims of ineffective assistance of counsel are not procedurally defaulted nor meritless; rather, she alleges that "post-conviction counsel inexplicably abandoned [Slimick's] claims of ineffective assistance of trial counsel at the last minute and submitted an inept appellant's brief, mostly copied from trial/appellate counsel's inadequate brief on direct appeal." *Id.* at 10.

## II.     LEGAL STANDARD

### A.  28 U.S.C. § 2254(d)

Slimick's amended petition is governed by 28 U.S.C. § 2254(d), as amended by AEDPA. Section 2254(d) provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

Under § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings "or if it decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court's "decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case[.]" *White v. Woodall*, 572 U.S. 415, 426 (2014). To be actionable under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), habeas relief is available if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2). The statute provides that a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings…are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006))).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The AEDPA "standard is difficult to meet…because it was meant to be." *Harrington*, 562 U.S. at 102; *see also Burt*, 571 U.S. at 20; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle "that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); *see also Woods*, 575 U.S. at 316.

AEDPA also imposes a "total exhaustion requirement," providing that "'[a]n application for a writ of habeas corpus…shall not be granted unless it appears that…the applicant has exhausted the remedies available in the courts of the State'" with respect to each claim, or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (second and third alterations in original) (quoting 28 U.S.C. § 2254(b)(1)(A)); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State…if he has the right under the law of the State to raise, by any available procedure, the question presented."). This "exhaustion doctrine is designed to give the state courts a full and fair

opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). AEDPA therefore requires a petitioner to "properly present[] his or her claims through one 'complete round of the State's established appellate review process.'" *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (quoting *id.* at 845). A petitioner incarcerated in Tennessee exhausts all available state remedies under AEDPA once the TCCA denies a claim of error. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39) (exhaustion of remedies)).

If a prisoner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). In such circumstances, the claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 116 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"). Tennessee prisoners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitations on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

The doctrine of procedural default in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 749–50; *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).

To demonstrate prejudice, a petitioner must show that the inadequacies worked to her "actual and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The prejudice requirement is not met where there is strong evidence of a petitioner's guilt and lack of evidence for her claim. *Id.* at 172.

To show sufficient "cause," a petitioner must point to "some objective factor external to the defense" that prevented her from raising the issue in her first appeal. *Murray*, 477 U.S. at 488. Generally, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause'" to overcome procedural default. *Martinez*, 566 U.S. at 10 (alteration in original) (quoting *Maples v. Thomas*, 565 U.S. 266, 280 (2012)); *see also Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986))). But the Supreme Court carved out an exception to this rule in *Martinez*, holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a [petitioner's] procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. Specifically, the Supreme Court held that

> [w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17. A "substantial" claim in this context is one that "has some merit." *Id.* at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). The Supreme Court explained that its holding in *Martinez* "acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper

consideration was given to a substantial claim." *Id.* The Supreme Court broadened *Martinez* in *Trevino v. Thaler*, 569 U.S. 413 (2013), holding that *Martinez* also applies where, although state procedural law may permit defendants to raise IATC claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal[.]" 569 U.S. at 429.

To determine whether a petitioner can overcome procedural default of an IATC claim based on ineffective assistance of post-conviction counsel under *Martinez* and *Trevino*, courts must consider:

> (1) whether state post-conviction counsel was ineffective [during initial collateral review proceedings]; and (2) whether [the petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez, Sutton,* and *Trevino.* Questions (1) and (2) determine whether there is cause. The next question is (3) whether [the petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [the petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits.

*Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015) (citations omitted).

Prior to 2022, the *Martinez-Trevino* framework was the sole controlling law on the issue of evidentiary hearings. But on the same day the State filed its answer to Slimick's amended petition, the Supreme Court decided *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), which significantly narrowed the circumstances in which a petitioner can obtain an evidentiary hearing. Under *Shinn*, federal habeas review of ineffective assistance of post-conviction counsel claims is limited to the state-court record and should not involve consideration of new evidence. 142 S. Ct. at 1734 ("We now hold that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."); *id.* at 1735 ("In sum, under § 2254(e)(2), a prisoner is 'at fault'

even when state postconviction counsel is negligent. In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."); and at 1738 ("Therefore, when a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied."). *See Houston v. Phillips*, 2022 U.S. App. LEXIS 22838, 2022 WL 3371349, at *8 (6th Cir. Aug. 16, 2022) ("the equitable rule announced in *Martinez* does not give federal courts authority to amend AEDPA's statutory directives and allow petitioners to expand state-court records to support their ineffective-assistance-of-state-postconviction-counsel claims.").

## B. Improper Jury Instructions

Obtaining federal habeas relief for a jury instruction claim is "a difficult hill to climb." *Keahey v. Marquis*, 978 F.3d 474, 478 (6th Cir. 2020). To show that a jury instruction violates due process, a habeas petitioner must demonstrate "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (citations omitted). A federal court may not grant the writ of habeas corpus on the ground that a jury instruction was incorrect under state law; instead, the relevant inquiry is whether the instructions were so infirm that they rendered the entire trial fundamentally unfair. *See Estelle*, 502 U.S. at 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551–52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429–30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). The jury instruction "must be considered in the context of the instructions as a

whole and the trial record." *Id.* at 72. Additionally, as the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

### C. Ineffective Assistance of Counsel

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right…to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court held in *Strickland v. Washington* that "the right to counsel is the right to the effective assistance of counsel." 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); *see also id.* at 685 ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

Deficient performance under *Strickland* is "measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Strickland*, 466 U.S. at 687, 688); *see also Wiggins*, 539 U.S. at 521 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (alteration omitted) (quoting *Strickland*, 466 U.S. at 688)). "[I]n applying *Strickland* [ ], hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' [ ] decisions are made and by giving a 'heavy measure of deference to counsel's judgments[.]'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691).

To establish prejudice under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 390 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Under AEDPA, a federal court's evaluation of an IATC claim decided on the merits in state court is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The court must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Id.* (first quoting *Strickland*, 466 U.S. at 689; and then quoting *Knowles*, 566 U.S. at 121 n.2)). In other words, the court must "give[ ] both the state court and the defense attorney the benefit of the doubt." *Burt*, 571 U.S. at 15. Viewed through AEDPA's "'deferential lens'" *Cullen*, 563 U.S. at 190 (quoting *Knowles*, 566 U.S. at 121 n.2), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" *Harrington*, 562 U.S. at 105.

### III.    ANALYSIS

The claims asserted in Slimick's amended petition fall into five procedural categories. Docket No. 12. There is one claim that the State concedes relates back to the initial pro se petition, is exhausted, and is ripe for this Court's review (Docket No. 21, p. 23); two claims that the State concedes relate back but argues are inexcusably procedurally defaulted (*Id.* at 16–22); four claims that the State argues do not relate back (*Id.* at 13–14); four claims of ineffective assistance of post-conviction counsel that Slimick argues should be reviewed in an evidentiary hearing; and two

claims that Slimick effectively concedes are waived (*Id.* at 8 ("Petitioner acknowledges this Circuit does not recognize cumulative error claims in habeas proceedings…[but] nevertheless maintains this claim in the event that the Supreme Court rules on the issue."); *id.* at 14 ("Petitioner concedes the effect of *Davila* on this claim [of ineffective assistance of trial counsel for failure to raise a juror-misconduct issue on direct appeal].")). This Report and Recommendation addresses only the claims that Slimick has not waived.

### A. Exhausted Claim

#### 1. Claim 6: Constitutionally Deficient Jury Instructions

The State concedes that Slimick's sixth claim for relief relates back to the initial pro se petition, is exhausted, and is ripe for this Court's review. Docket No. 21, p. 23. Claim 6 alleges four issues with the jury instructions provided during Slimick's trial. Docket No. 12, pp. 42–45. Slimick asserts that the trial court erred by instructing the jury that:

> (1) the defendant had the burden of raising the issue of self-defense; (2) that the self-defense instruction was confusing to the jury because it combined self-defense and "no duty to retreat" concepts in tone [*sic*] sentence; (3) that the jury instructions improperly failed to list the negation of self-defense in the litany of items which the State must prove beyond a reasonable doubt; (4) and that the instructions failed to list lesser included offenses whenever the "charged offense" was referenced.

Docket No. 12, p. 43.

Slimick argues that the errors "misled and confused the jury and as written, shifted the burden of proving self-defense to [Slimick] whereas, since self-defense was raised by the proof…it was the State's burden to prove that [Slimick] did not act in self-defense." Docket No. 12, p. 45. As a result, Slimick contends, her "constitutional right to a complete and correct charge" was denied. *Id.*

The State concedes that Slimick exhausted this claim by raising it in state post-conviction proceedings before the TCCA. Docket No. 21, p. 24. It argues, however, that Slimick is not entitled

29

to relief because each of the issues Slimick raises with the jury instructions lacks merit. *Id.* at 23–

30.

### a) The TCCA's Findings

On direct appeal, the TCCA analyzed this claim and its four sub-issues as follows:

#### B. Submission of a Question of Law to the Jury

The defendant asserts error in the trial court's inclusion of the prefatory words of the pattern jury instructions regarding whether the defense of self-defense had been fairly raised by the evidence. The trial court instructed the jury: "If evidence has been introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that [the defendant] did not act in self-defense."

The defendant, on the first day of the trial, filed a document making special requests for jury instructions. The filing included a request to remove the phrase "If evidence has been introduced supporting self-defense," as improperly submitting a question of law to the fact-finder. During the charge conference, however, the defendant did not request that the court take out the phrase. The parties had an extensive discussion of the self-defense instruction, and the defense requested several alterations. At the end of the discussion, the court asked if there were any other issues with the second page of the self-defense instruction, and the defense answered in the negative.

Tennessee Rule of Criminal Procedure 30(b) addresses objections to jury instructions. Under Rule 30(b), "[c]ounsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial." Tenn. R.Crim. P. 30(b). When the defendant challenges an erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, Rule 30 allows the issue to be raised in the motion for a new trial even if no objection was made contemporaneously. *State v. James,* 315 S.W.3d 440, 446 n.2 (Tenn.2010); *State v. Faulkner,* 154 S.W.3d 48, 58 (Tenn.2005); *State v. Lynn,* 924 S.W.2d 892, 899 (Tenn.1996).

The pattern jury instruction for self-defense, citing to Tennessee Code Annotated section 39–11–201(a)(3), includes the sentence, "If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense." 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b). The jury instructions in the defendant's trial were taken verbatim from this pattern, with the exception that the defendant's name was substituted.

Under Tennessee Code Annotated section 39–11–203(c), "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." The comments clarify that "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable. If the defense is at issue, the state

must prove beyond a reasonable doubt that the defense does not apply." T.C.A. § 39–11–203 Sentencing Comm'n Cmt.

The initial determination regarding whether evidence fairly raising self-defense has been introduced is one for the trial judge. *State v. Bledsoe,* 226 S.W.3d 349, 355 (Tenn.2007) ("To determine if a defense has been fairly raised by the proof, *a court* must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that may be drawn therefrom." (Emphasis added)); *see also State v. Hatcher,* 310 S.W.3d 788, 816–17 (Tenn.2010); *State v. Davenport,* 973 S.W.2d 283, 287 (Tenn.Crim.App.1998); *State v. Blackmon,* 78 S.W.3d 322, 331 (Tenn.Crim.App.2001) ("The threshold question of whether the defense of entrapment has been =fairly raised' is for determination by the judge and not the jury."); *State v. Bult,* 989 S.W.2d 730, 733 (Tenn.Crim.App.1998) (noting that *a court* considers the evidence in the light most favorable to the defendant in order to determine if the defense is fairly raised by the proof). We conclude that the trial court should not have included in the jury instructions the prefatory phrase, "If evidence is introduced supporting self-defense," because this was not a proper determination for the jury but for the court itself.

However, an error in instructing the jury is subject to harmless error review. *Cauthern v. State,* 145 S.W.3d 571, 600 (Tenn.Crim.App.2004). When the error is constitutional in nature, then the burden is on the State to prove harmlessness beyond a reasonable doubt. *State v. Rodriguez,* 254 S.W.3d 361, 371 (Tenn.2008). Not every erroneous instruction "rises to the level of constitutional error." *Faulkner,* 154 S.W.3d at 60 (concluding that error in including nature-of-conduct language in instruction was not constitutional error). When error is not constitutional, a final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R.App. P. 36(b). Here, the error in submitting the issue to the jury did not deprive the defendant of her constitutional right to a jury trial or any other constitutional right, and we apply non-constitutional harmless error analysis. *See Rodriguez,* 254 S.W.3d at 371.

The defendant's theory of the case throughout trial was that she acted in self-defense. Evidence pertinent to self-defense, including bruises sustained by the defendant, her statement to the 911 operator, the victim's threatening text messages, items knocked over in the bedroom, a knife in the bed, and evidence that the victim possessed the murder weapon, were introduced at trial. The defendant's cross-examination of witnesses asked them to confirm that the defendant's injuries were consistent with her having been assaulted. Both the defense and the State referred numerous times during opening and closing argument to self-defense. The State acknowledged to the jury in closing that the 911 call was evidence of self-defense. The prosecutor argued that the knife was in the bed because "if you're going to claim self-defense, you've got to give them a weapon." The prosecutor's last words to the jury were, "Did she act in self-defense[?] I believe the State has carried its burden that she did not act in self-defense, and we would ask you to find [the

31

defendant] guilty of the first-degree murder of [the victim]." The prosecution in effect conceded to the jury that evidence was introduced supporting self-defense and that the jurors had to determine whether the State had negated the defense beyond a reasonable doubt. Accordingly, there is simply no possibility of jury confusion regarding the fact that evidence of self-defense had been introduced and that the jury was required to consider the issue. The error in including the prefatory phrase was harmless by any standard, and the defendant is not entitled to relief.

C. Combining "No Duty to Retreat" Instruction with Self–Defense Instruction

The defendant also objects to the trial court's instructions regarding self-defense and "no duty to retreat" on the basis that combining the concepts into one sentence was confusing to the jury. The trial court instructed the jury:

> If [the defendant] was not engaged in unlawful activity and was in a place where she had a right to be, she would also have no duty to retreat before threatening or using force intended or likely to cause death if [the defendant] had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

This instruction was drawn verbatim from the pattern jury instructions. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b). In its written request to the trial court, the defendant proposed altering the instruction as follows:

> In the defense of self, a defendant may use force intended or likely to cause death or serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

> If a defendant was not engaged in unlawful activity and was in a place where she had a right to be, the defendant has no duty to retreat before using force intended or likely to cause death or serious bodily injury.

The defendant's alteration essentially consisted in separating the "no duty to retreat" concept and placing it in a sentence after the self-defense instruction. As the defendant notes, the pattern jury instructions are taken from the statute delineating self-defense:

> 2) Notwithstanding § 39–17–1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39–11–611(b).

A defendant has a right to a correct and complete jury charge. *State v. Garrison,* 40 S.W.3d 426, 432 (Tenn.2000). This right is constitutional in nature. *State v. Phipps,* 883 S.W.2d 138, 142 (Tenn.Crim.App.1994). The trial court must present the propositions of law governing the case plainly to the jury, in such a manner as to enable them to comprehend the principles involved. *State v. Williamson,* 919 S.W.2d 69, 80 (Tenn.Crim.App.1995). "Nothing short of this will 'satisfy the demands of justice' or the defendant's right to a jury trial." *Id.* (quoting *Crawford v. State,* 44 Tenn. 190, 195 (1867)).

The defendant cites to *State v. McAfee,* where this court examined jury instructions which tracked the statutory language regarding use of a prior conviction to establish that the defendant was a habitual offender. *State v. McAfee,* 737 S.W.2d 304, 308 (Tenn.Crim.App.1987). The court in *McAfee* stated that the accused " 'is entitled to a clear and distinct exposition of the law of his case as applicable to the facts,' " and it concluded that the statute was so confusing that the trial court should have included an explanation in its instructions. *Id.* (quoting *Strady v. State,* 45 Tenn. 300, 307 (1868)). "Simply reading a statute to the jury, when the statute is ambiguous and open to more than one interpretation, does not satisfy 'the demands of justice' or the accused's constitutional right of trial by jury." *State v. Raines,* 882 S.W.2d 376, 382 (Tenn.Crim.App.1994).

Nevertheless, "[a]n instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner,* 154 S.W.3d 48, 58 (Tenn.2005). When a trial court's instructions correctly, fully, and fairly set forth the applicable law, the trial court's refusal to give a requested special instruction does not amount to error. *Phipps,* 883 S.W.2d at 142.

The instructions here, while not perhaps a model of clarity, adequately set forth the applicable law and the issues of fact which the jury had to determine. Unlike the statutory language requiring reversal in *McAfee,* the statute forming the basis for the challenged instruction was not ambiguous in any way. *See McAfee,* 737 S.W.2d 304, 308 ("The language of the statute incorporated in the trial court's charge is confusing and lends itself to an interpretation that the principal or triggering offense can be used as one of the three prior convictions alluded to in the statute."). We conclude that the defendant is not entitled to relief.

## D. Self–Defense Instruction

The defendant challenges the trial court's refusal to include the requested instructions on self-defense in the section regarding the State's burden of proof. The defendant requested the following instructions:

> To convict [the defendant] of any criminal offense, the State must have proven beyond a reasonable doubt:
>
>> (1) all of the elements of the crime charged or any lesser included offenses,
>>
>> (2) the negation of the defense of self-defense, and
>>
>> (3) that the crime charged or any lesser included offenses of it was committed before the finding and returning of the indictment in this case.

The trial court instead charged the jury:

> The State must have proven beyond a reasonable doubt all of the elements of the crime charged, and that it was committed before the finding and returning of the indictment in this case.

The defense points to Tennessee Code Annotated section 39–11–201, which clarifies what the State must prove in order to obtain a conviction. The statute mandates that:

> (a) No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:
>
>> (1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;
>>
>> (2) The culpable mental state required;
>>
>> (3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and
>>
>> (4) The offense was committed prior to the return of the formal charge.

T.C.A. § 39–11–201. While the trial court's instructions on burden of proof included the requirement that the elements of the crime and the timing of the offense must be proven beyond a reasonable doubt, the instructions did not track the statute in that they did not include the requirement that the State must negate any defense beyond a reasonable doubt. The trial court's instructions were taken

verbatim from the pattern jury instructions. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 2.04.

The defendant does not dispute that the trial court charged the jury regarding the State's burden to negate self-defense elsewhere in the instructions. The trial court's instructions included the following language in the section regarding self-defense:

> If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that [the defendant] did not act in self-defense.

> If from all the facts and circumstances you find [the defendant] acted in self-defense, or if you have a reasonable doubt as to whether [the defendant] acted in self-defense, you must find her not guilty.

On appeal,[3] the defense also requests that this court suggest pattern jury instructions which include, as an element of each offense charged and each lesser included offense, the requirement that the State negate self-defense. For instance, the defendant asserts that the elements of first degree murder should be as follows:

> First Degree Murder

> Any person who commits the offense of First Degree Murder is guilty of a crime.

> For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) That the defendant unlawfully killed the alleged victim;

> and

> (2) that the defendant acted intentionally ....;

> and

> (3) that the killing was premeditated;

> and

> (4) that the killing was not done in self-defense.

The defendant suggests that this court should hold that non-affirmative defenses must be charged, not in isolation, but in conjunction with the other matters which the State must prove beyond a reasonable doubt to obtain a conviction, and he asserts that this error has denied the defendant her constitutional right to a jury

---

[3] The defendant did not request this instruction at trial either in her written filing or during the charge conference.

trial.[4] The State acknowledges that the State bears the burden of negating a non-affirmative defense beyond a reasonable doubt but asserts that the jury instructions adequately conveyed the State's burden to the jury.

We reiterate that the trial court's duty is to provide a complete charge of the law as applicable to the facts of the case. *State v. James,* 315 S.W.3d 440, 446 (Tenn.2010). The judge must properly instruct the jury "on the law governing issues raised by the evidence introduced at trial," and must submit on proper instructions "every issue of fact raised by the evidence and material to [the] defense." *Phipps,* 883 S.W.2d at 142, 149. Because jurors are "usually untrained in the law and unfamiliar with its myriad intricacies," they depend on instructions from the trial court in deliberating. *State v. Davis,* 266 S.W.3d 896, 907 (Tenn.2008). Jury instructions can be "confusing, tedious, and perhaps initially overwhelming to a juror." *Id.* The court should consider that:

> [j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*State v. Vann,* 976 S.W.2d 93, 101 (Tenn.1998) (quoting *Boyde v. California,* 494 U.S. 370, 380–81 (1990)).

"Although the Pattern Jury Instructions do not have the force of law, our trial courts 'frequently use them as a source for jury instructions.' " *Davis,* 266 S.W.3d at 901 n.2 (quoting *State v. Rutherford,* 876 S.W.2d 118, 120 (Tenn.Crim.App.1993)). Pattern jury instructions, which are not officially approved by the appellate courts or legislature, "should be used only after careful analysis." *State v. Hodges,* 944 S.W.2d 346, 354 (Tenn.1997). Pattern jury instructions are only suggestions and "are not entitled to any particular deference on review." *State v. Rimmer,* 250 S.W.3d 12, 30 (Tenn.2008). "Trial courts are not limited to the mere recitation of the pattern instructions," *James,* 315 S.W.3d at 446, and the defendant is entitled to have the jury properly instructed to consider every issue of fact raised by the evidence, *Phipps,* 883 S.W.2d at 149–50.

"An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the

---

[4] The defense cites to the Model Penal Code and to Hawaii's statutory scheme, which incorporate the State's duty to disprove a defense into the elements of the offense. *See* Model Penal Code § 1.13 ("=element of an offense' means (i) such conduct or (ii) such attendant circumstances or (iii) such a result of conduct as ... negatives an excuse or justification for such conduct"); Haw.Rev.Stat. § 702–205 ("The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: ... (b) Negative a defense"). We note that the commentary to the Hawaii Criminal Jury Instructions declares that "[t]he Committee was unable to agree on whether negating a defense, when properly raised, should be set forth as an element in the elements instruction, or whether it is sufficient that a clear statement of the prosecution's burden to negate the defense beyond a reasonable doubt be contained in the instruction on the defense." Haw. Pattern Jury Instructions—Criminal 5.01 commentary.

jury as to the applicable law." *State v. Faulkner,* 154 S.W.3d 48, 58 (Tenn.2005). In reviewing jury instructions, we do not parse phrases to determine their validity in isolation; rather, we examine the instructions as a whole to determine " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " *James,* 315 S.W.3d at 446 (quoting *Rimmer,* 250 S.W.3d at 31). Accordingly, an appellate court must determine if there is a reasonable likelihood that the jury applied the challenged instruction in such a way that the defendant's constitutional rights have been violated. *Rimmer,* 250 S.W.3d at 31. Due process guarantees that "every fact necessary" to constitute the crime must be proven beyond a reasonable doubt. *James,* 315 S.W.3d at 447 (quoting *In re Winship,* 397 U.S. 358, 364 (1970)).

The statutory language requires the State to prove beyond a reasonable doubt the elements of the offense, including mens rea, the timing of the return of the indictment, and the negation of any non-affirmative defense when it has been raised by the proof. T.C.A. § 39–11–201(a). While the requested instruction was not given in conjunction with the other statutory requirements, the jury instructions clearly informed the jury that the State bore the burden of negating self-defense beyond a reasonable doubt and that if the jurors had reasonable doubt that the defendant acted in self-defense, they were to acquit her. Jurors bring a common-sense understanding of self-defense to deliberations. This is not a case where subtleties in legal distinction "would be lost on most jurors absent clear instructions." *Phipps,* 883 S.W.2d at 150.

We conclude that the instructions here, read as a whole, adequately convey the State's burden of proof regarding self-defense, and we conclude that the defendant's constitutional rights were not violated by the trial court's failure to include the State's duty to negate self-defense multiple times in the instructions. *See James,* 315 S.W.3d at 453–54 (concluding that there was not error in instructions which might have been improved by including the term "corroboration" but as a whole were "compliant with the traditional definition" of corroborating evidence and sufficiently emphasized the State's burden of proof with regard to each element); *Hodges,* 944 S.W.2d at 354 (instructions which erroneously instructed jurors to consider mitigating circumstances which had been "proven" rather than "raised" were nevertheless adequate because the proper standard was clarified elsewhere in the instructions); *Vann,* 976 S.W.2d at 101–02 (concluding that although the proof did not warrant a proximate cause instruction, the instructions did not shift the burden of proof to the defendant and that the jury instructions, as a whole, did not relieve the State of proving intent); *Faulkner,* 154 S.W.3d at 60–61 (concluding that, although both result-of-conduct and nature-of-conduct language were included in the definition of "intentionally," the entire charge "eliminated any risk of the jury applying the wrong definition" and there was no constitutional error); *Rimmer,* 250 S.W.3d at 30, 31 (concluding that instructions that reasonable doubt "does not mean a doubt that may arise from possibility" were not misleading in the context of instructions which also gave a correct definition of the term); *but see Phipps,* 883 S.W.2d at 151 (the jury charge did not provide a clear and distinct exposition of the law when the jury instructions

suggested that consideration of evidence of post-traumatic stress disorder was not pertinent to *mens rea* ).

The conclusion that the instructions here were adequate to protect the defendant's rights to a trial by jury and to due process does not preclude the conclusion that the State's burden to negate self-defense might be further clarified. *See State v. Jackson,* 173 S.W.3d 401, 407–08 (Tenn.2005) (holding that instructing jury regarding a presumption in favor of second degree murder should be abandoned but concluding that this was a mere clarification of the law); *Miller v. State,* 54 S.W.3d 743, 747 (Tenn.2001) (recognizing that the court's "abandonment of a potentially confusing jury instruction does not automatically mean that prior use of the abandoned jury instruction was constitutional error"); *Rimmer,* 250 S.W.3d at 31 (concluding that the challenged instruction was not helpful, and that its use, while not rising to the level of a constitutional violation, should be discouraged).

As the defendant notes, both this court and the Tennessee Supreme Court have taken occasion to suggest or clarify jury instructions. *See State v. Page,* 81 S.W.3d 781, 788 (Tenn.Crim.App.2002) (clarifying correct jury instruction for knowing second degree murder, which the court determined to be a result-of-conduct offense); *see also State v. White,* 362 S.W.3d 559, 580–81 (Tenn.2012) (concluding that jury instructions for "substantial interference" element of kidnapping were inadequate and providing interim instructions while inviting the Tennessee Pattern Jury Instruction Committee to revise the pattern jury instructions); *State v. Dyle,* 899 S.W.2d 607, 612 (Tenn.1995) (promulgating instructions regarding identity in light of fallibility of eyewitness testimony); *cf. State v. Farner,* 66 S.W.3d 188, 205 (Tenn.2001) (concluding that absence of proximate cause instruction from pattern criminally negligent homicide causation required general causation instruction to be given to the jury). Because we conclude that the instructions here, in contrast to those above, were not erroneous, we decline to suggest revised jury instructions. We instead invite the Tennessee Pattern Jury Instruction Committee to visit the issue in order to determine whether a revision to the instructions is warranted to better convey to the jury the State's burden of proof regarding the negating of non-affirmative defenses beyond a reasonable doubt.

E. Lesser–Included Offenses Within Instructions on Burden of Proof and Identity

The defendant next asserts that the trial court erred in failing to grant the defendant's request to give "equal dignity" to the lesser-included offenses by essentially including the phrase "or any lesser included offenses" in instances where the instructions refer to the "crime charged."

The defendant's special request asked the court to charge the jury regarding the burden of proof as follows:

> .... This presumption remains with [the defendant] throughout every stage of the trial, and it is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that [the defendant] is guilty *of the charged or any lesser included offenses*.

....

To convict [the defendant] of any criminal offense, the State must have proven beyond a reasonable doubt:

(1) all of the elements of the crime charged *or any lesser included offenses,*

(2) ...

(3) that the crime charged *or any lesser included offenses* was committed before the finding and returning of the indictment in this case.

(Emphasis in original). Instead, the trial court charged the jury:

This presumption remains with [the defendant] throughout every stage of the trial, and it is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that [the defendant] is guilty.

....

The State must have proven beyond a reasonable doubt all of the elements of the crime charged, and that it was committed before the finding and returning of the indictment in this case.

The defendant also requested the court to alter the charge on identity to mention lesser-included offenses:

The Court further charges you that if you are satisfied from the whole proof in the case, beyond a reasonable doubt, that the defendant ... committed the crime charged against her *or any lesser included offenses,* and you are satisfied beyond a reasonable doubt that she has been identified as the person who committed the crime charged *or any lesser included offenses,* then it would be your duty to convict her *of the crime charged or any lesser included offenses.* On the other hand, if you are not satisfied with the identity from the proof, or you have a reasonable doubt as to whether she has been identified from the whole body of the proof in the case, then you should return a verdict of not guilty.

The trial court's charge to the jury omitted the italicized portions of the text above.

The defendant asserts that the failure to include the requested language was error requiring reversal. The defendant's constitutional right to a complete and correct charge includes the right to jury instructions on all lesser-included offenses which are supported by the proof. *State v. Thorpe,* 463 S.W.3d 851, 859 (Tenn.2015). "When lesser-included offenses are included in the charge, a judge must instruct the jury on how and in what order it should consider the offenses." *Bryant v. State,*

460 S.W.3d 513, 524 (Tenn.2015). The Tennessee Supreme Court has concluded that policy considerations support the use of "acquittal-first" jury instructions, requiring the jury to acquit on a greater offense before it may consider a lesser. *State v. Davis,* 266 S.W.3d 896, 907 (Tenn.2008). Neither the defendant nor the prosecution is permitted to preclude the jury from considering a lesser included offense as part of trial strategy. *State v. Brown,* 311 S.W.3d 422, 431 (Tenn.2010).

Here, while the trial court refused to include the references to lesser-included offenses in the parts of the jury charge concerning identity and burden of proof, the remainder of the charge clearly informed the jury that it must consider the lesser-included offenses if it chose to acquit on the greater offense, that it must consider them in sequence, and that the State bore the burden of proving the lesser-included offenses beyond a reasonable doubt. For each lesser-included offense, the trial court's instructions directed the jury that "the State must have proven beyond a reasonable doubt the existence of the following essential elements" in order for the jury to find the defendant guilty of the offense. Furthermore, in the section instructing the jury on "Order of Consideration," the trial court reiterated that a guilty verdict required the jury to "find the defendant guilty beyond a reasonable doubt of the lesser-included offense" and that if the jury found "reasonable doubt as to the defendant's guilt of the lesser-included offense," then it should acquit on that offense and consider the next lesser-included offense. In jury deliberations, "common[ ]sense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting." *State v. Van Tran,* 864 S.W.2d 465, 479 (Tenn.1993) (quoting *Boyde v. California,* 494 U.S. 370, 380–381 (1990)). We conclude that the instructions, read as a whole, were not deficient or likely to mislead the jury, and the defendant is not entitled to relief.

*State v. Slimick*, 2015 WL 9244888, at *15–22 (Tenn. Crim. App. Dec. 17, 2015).

### b) Present Findings

This Court agrees with the State that this claim does not support habeas corpus relief. Because this claim was adjudicated on the merits by the state court, Slimick must meet the requirements set out in 28 U.S.C. § 2254(d) in order to obtain relief on this claim. Slimick must show that the state court's decision was (1) "contrary to, or involved in an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Mammone v. Jenkins*, 49 F.4th 1026, 1041 (6th Cir. 2022).

As described above, the standard set forth in 28 U.S.C. § 2254(d) "is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181. This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "extreme malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. at 102. *See also Woods v. Donald*, 575 U.S. 312, 316 (2015). It has been described as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

State law instructional errors rarely justify federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Indeed, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* (citation omitted). As mentioned above, to warrant habeas relief, a petitioner must show that the challenged instruction, viewed in light of the jury instructions as a whole, "so infected the entire trial that the resulting conviction violates due process." *Id.* (quotation marks and quotation omitted); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right].") (quotation marks and quotation omitted). If a petitioner fails to make this showing, the petitioner is not entitled to relief. *White v. Mitchell*, 431 F.3d 517, 533 (6th Cir. 2005). An instruction's ambiguity also provides no relief unless the petitioner shows "there is a reasonable likelihood that the jury [] applied the instruction improperly." *Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997) (citing *Estelle*, 502 U.S. at 67, 72). If a trial court misreads state law in an instruction, a petitioner is not entitled to relief unless the trial court "misread it so badly that it violated the Sixth and Fourteenth

Amendments." *Keahey v. Marquis*, 978 F.3d 474, 478 (6th Cir. 2020). This means that the infirm instruction "so infused the trial with unfairness as to deny due process of law." *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Here, Slimick's claimed errors do not rise to the level of being "so egregious that they render[ed] the entire trial fundamentally unfair." *White v. Mitchell*, 431 F.3d at 517. While the Tennessee Court of Criminal Appeals took issue with the clarity and content of some of the instructions, the record supports its ultimate finding that the trial judge did not abuse his discretion nor commit error in denying Slimick's special requests for jury instructions. In fact, the TCCA observed that no error occurs from denying a defendant's request for a special jury instruction so long as the applicable law is "correctly, fully, and fairly set forth[.]" *Slimick*, 2015 WL 9244888, at *17.

Slimick argues that most of her claimed errors "misled and confused the jury" (Docket No. 12, p. 45); however, this argument is conclusory and finds little support in the record. Most of Slimick's special requests—all of which were denied—involved the order of certain phrases within certain sections of the instructions. But while these *precise* requests were not granted, the *spirit* of her requests is certainly found in the contents of the final instructions that were read to the jury. First, as the State notes, the Tennessee Court of Criminal Appeals determined that the phrase "[i]f evidence has been introduced supporting self-defense" was a harmless error because Slimick "clearly introduced evidence supporting her self-defense claim throughout trial, including opening and closing arguments and cross-examination of the witnesses." Docket No. 21, p. 25 (citing *Slimick*, 2015 WL 9244888, at *17). Further, the prosecution's last words to the jury were that the prosecution met "its burden that [Slimick] did not act in self-defense." *Id.* Because the State plainly admitted that it bore the burden of negating self-defense, the Tennessee Court of Criminal Appeals

did not err in finding that this harmless error did not violate Slimick's constitutional rights. Second, the TCCA's finding that combining self-defense and the duty to retreat in one sentence was not confusing to the jury finds support in the fact that Slimick does not argue that the pattern instruction was legally inaccurate, nor does she explain how the TCCA's decision was "so lacking in justification" to warrant relief. *See* Docket No. 12, pp. 43–45. Slimick's third and fourth arguments regarding the negation of self-defense and equal dignity to lesser-included offenses (*Id.* at 44–45) fail for the same reasons, in addition to Slimick's failure to argue how the TCCA unreasonably applied federal constitutional law when it denied relief on the claim. *Id.*

Considering the evidence before the state court, this Court finds that Slimick has not met her burden of establishing that the state court's decision on the claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence presented. To recycle the argument of the State, Slimick's arguments "do[] nothing but seemingly relitigate the unsuccessful argument[s] [Slimick] made on direct appeal and do[] not address how the TCCA's application of federal constitutional law was so unjustifiable to warrant relief." Docket No. 21, p. 28. As mentioned above, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 787–88. Slimick has not met this rigorous threshold, so habeas relief is not warranted on Claim 6.

### B. Procedurally Defaulted Claims

#### 1. <u>Claims 5(a)(i) and 5(b): Trial Counsel's Failure to Call Slimick to Testify for Her Own Defense and Failure to Recommend That Slimick Accept the Plea Offer</u>

The State concedes that Claims 5(a)(i) and 5(b) relate back to Slimick's initial pro se petition; however, the State avers that both claims are inexcusably procedurally defaulted. Docket

No. 21, p. 14. Thus, according to the State, Slimick "lacks any right 'under the law of the State to raise, by any available procedure, the question[s] presented.'" *Id.* at 16 (citing 28 U.S.C. § 2254(c)).

In her reply, Slimick explicitly argues that none of her claims are procedurally defaulted. Docket No. 26, p. 8. But despite this explicit assertion, she appears to concede procedural default by arguing that she is a "*Martinez*-postured habeas petitioner" in light of her post-conviction counsel's ineffective assistance. Docket No. 12, p. 1.

### a) Present Findings

The Court finds that the procedural default of Claims 5(a)(i) and 5(b) should not be excused and that habeas corpus relief is not warranted. Slimick failed to raise Claims 5(a)(i) and 5(b) before the Tennessee Court of Criminal Appeals, and Tennessee law now bars proper exhaustion in the state courts. *See* Tenn. Code Ann. § 40-30-106(g) ("[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . ."). Thus, Slimick has procedurally defaulted these claims. And for the reasons stated below, the procedural default should not be excused for either claim.

### (i) Claim 5(a)(i): Trial Counsel's Failure to Call Slimick to Testify for Her Own Defense

As noted by the State, Slimick raised then voluntarily struck Claim 5(a)(i) in the post-conviction court, thereby waiving the claim. Docket No. 21, p. 17; *see* Docket No. 20-48, p. 242. While under oath, Slimick answered the court's questions about her choice to strike her claims of ineffective assistance of counsel in a manner that made it "clear to the Court that the petitioner made a knowing and voluntary waiver of said grounds." Docket No. 20-48, p. 242. She also stated under oath "that she was satisfied with the representation of her post-conviction counsel." *Id.*

Further, Slimick cannot establish sufficient cause or prejudice for Claim 5(a)(i) to warrant further review. The Tennessee Court of Criminal Appeals discussed and reviewed a litany of evidence lending itself to Slimick's claim of self-defense—Slimick's text messages to Bell regarding moving in with him and his possession of a gun, Bell's threatening text messages to Slimick, the gunshot pattern, investigator testimony during trial, Slimick's 911 call, and the crime scene. *Slimick*, 2015 WL 9244888 at *3–9. Although Slimick argues that her personal testimony would have affected the outcome of the trial (Docket No. 26, p. 12), this Court agrees with the State that Slimick's testimony would have been cumulative in light of the evidence discussed above. Slimick, thus, cannot establish a "reasonable probability" of a different trial outcome had counsel called her to testify. *Strickland*, 466 U.S. at 694. Slimick also cannot establish counsel's deficient performance because Slimick herself testified under oath that she was knowingly and voluntarily waiving her right to testify based on her discussions with her attorneys. Docket No. 20-22, pp. 1849–50. She asserts that her waiver was not knowing nor voluntary because counsel's advice during those discussions was "clearly erroneous." Docket No. 26, p. 12. But this assertion actually bolsters the argument advanced by the State: Slimick "cannot challenge [counsel's] performance simply because it was unsuccessful with the benefit of hindsight." Docket No. 21, p. 19 (citing *Strickland*, 466 U.S. at 689–90). Thus, habeas relief is not warranted for Claim 5(a)(i).

### (ii)    Claim 5(b): Trial Counsel's Failure to Recommend That Slimick Accept the Plea Offer

In her reply, Slimick argues that counsel was ineffective for failing "to directly advise Petitioner . . . that if she proceeded to trial, her only chance of prevailing was to testify, and if she decided not to testify, the probable outcome would be that she would be found guilty." Docket No. 26, p. 13. But as the State points out (Docket No. 21, p. 22), trial counsel's December 15, 2013, letter explicitly advises Slimick to plead guilty considering the evidence they discussed. Docket

No. 12-8. Counsel's second-to-last paragraph in the letter reads, "You asked me what you should do. I explained that there are severe dangers in the case and if the jury does not believe you that you could be convicted of first degree murder." *Id.* at 3. After receipt of counsel's letter, Slimick had agreed to plead guilty, but then later changed her mind. *See* Docket No. 20-7, p. 5. Because Slimick revoked her guilty plea, Slimick cannot establish "a reasonable probability that the plea offer would have been presented to the court (i.e., that [she] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)." *Lafler v. Cooper*, 566 U.S. 156, 162–68 (2012).

Trial counsel owed no responsibility to Slimick to predict the future. Trial counsel's sole responsibility was to advise Slimick based on his knowledge at the time of the proceedings, which he did in both his November 27, 2013, and December 15, 2013, letters. Docket No. 12-7; Docket No. 12-8. As a result, habeas relief is not warranted for Claim 5(b).

### 2. Claims 5(a)(ii)–(iv) and 5(c)(i): Trial Counsel's Failure to Call Certain Experts, Failure to Exclude Prejudicial Testimony, and Failure to Fully Establish Juror Misconduct Issue at Motion-for-New-Trial Stage

The parties seem to agree that the original pro se petition (Docket No. 1) was timely filed and that the amended petition (Docket No. 12) was filed after the expiration of the one-year limitation period. Docket No. 21, p. 13; Docket No. 26, p. 1. The State argues that Claims 5(a)(ii)–(iv) and 5(c)(i) in the amended petition do not relate back to Slimick's initial pro se petition because they don't share a "common core of operative facts" as those alleged in the initial petition. Docket No. 21, pp. 13–14; *see Cowan*, 645 F.3d at 818; *see also Mayle*, 545 U.S. at 664.

Slimick counters that Claims 5(a)(ii)–(iv) and 5(c)(i) do relate back because they "share a common core of operative facts with the pro se petition while clarifying and amplifying with specificity the claims of ineffective assistance of counsel." Docket No. 26, p. 3. Additionally,

Slimick argues that the State "should not be permitted to assert that the claims raised in the amended petition are untimely after agreeing to [two] extensions of the filing date." *Id.* at 2.

### a) Claims 5(a)(ii)–(iv): Trial Counsel's Failure to Call Certain Experts and Failure to Exclude Prejudicial Testimony

The Court agrees with the State that Claims 5(a)(ii)–(iv) do not relate back to Slimick's initial petition. When comparing these claims to those in the initial pro se petition, these claims introduce new facts that were not alleged anywhere in Slimick's initial petition. *See Mayle*, 545 U.S. at 664 (finding "[a]n amended habeas petition…does not relate back when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"). When additional ineffective assistance of counsel claims are raised in an amended petition, those claims do not relate back simply because a petitioner raised other ineffective assistance of counsel claims in the prior petition. *Watkins v. Deangelo-Kipp*, 854 F.3d 836, 848-51 (6th Cir. 2017); *Hill v. Mitchell*, 842 F.3d 910, 922-26 (6th Cir. 2016). The facts in support of Slimick's initial claim of ineffective assistance of trial counsel are:

> Trial counsel advised Petitioner not to testify and advised Petitioner's witnesses, Kenneth Slimick and Sandra Slimick, they would not be called as defense witnesses. Had Petitioner been called to testify, she would have established her self-defense proof and rebutted the State's witnesses' testimony of premeditated killing. Mr. and Mrs. Slimick would have testified in support of the Petition's [*sic*] self-defense theory explaining the turbulent and violent relationship the alleged victim inflicted on the Petitioner. Trial counsel failed to offer competent advice about the State's plea offer. Attorney Wells was indicted for drug distribution and entered a guilty plea. A juror violated the trial court's instruction not to communicate via social media during the trial. Appellate counsel did not raise the issue on direct appeal. The appellate court concluded "the Petitioner's claim that juror conduct violated her Sixth Amendment right to a jury trial and Fourteenth Amendment right to due process has been waived because the Petitioner failed to present this claim to this court on direct appeal pursuant to Tennessee Code Annotated section, 40-30-106(g)."

Docket No. 1, pp. 9–10.

In her reply, Slimick points to *Cowan v. Stovall*, 645 F.3d at 818, for support in favor of relation back for Claims 5(a)(ii) and 5(a)(iii). Docket No. 26, p. 2. But because Slimick specifically names her parents as the defense witnesses that counsel should have called (*Id.* at 3), her reliance on *Cowan* is misplaced. The initial pro se petition in *Cowan* solely mentioned unnamed "'willing and available' witnesses," and the subsequent amended petition "spelled out in greater detail" who those witnesses are and "the substance of what their testimony would have been." 645 F.3d at 818. In Slimick's initial pro se petition, she did, in fact, "spell[] out in great detail" the witnesses that should have been called—herself and her parents. Docket No. 1, p. 9. Thus, adding additional expert witnesses in Slimick's amended petition would defeat the intent of the *Cowan* court: to allow a petitioner to amend if "[t]he facts recited in the two documents differed not in kind, but in specificity." 645 F.3d at 819. Claims 5(a)(ii) and 5(a)(iii) do not relate back to Slimick's initial petition for these reasons.

Additionally, Claim 5(a)(iv) alleges facts that do not appear anywhere in Slimick's initial petition. Not only does Slimick fail to mention the specific allegation of trial counsel's failure to "exclude unfair, prejudicial testimony pertaining to the Petitioner's offensive sexual acts with Mr. Bell," but she also fails to mention any sexual acts or even Mr. Bell's name in her initial petition *at all*. *Compare* Docket No. 12, p. 34 *with* Docket No. 1, pp. 21-23, 37-42, 28-35.

For these reasons, Claims 5(a)(ii)–(iv) do not relate back and are, thus, time-barred.

### b) Claim 5(c)(i): Trial Counsel's Failure to Fully Establish Juror Misconduct Issue at Motion-for-New-Trial Stage

Slimick avers that Claim 5(c)(i) relates back to her initial pro se petition because it shares a "common core of operative facts" with her initial petition. Docket No. 26, p. 4. She argues that Claim 5(c)(i) "effectively amplifies and clarifies" the claim in her initial petition pertaining to appellate counsel's failure to raise the juror misconduct issue on direct appeal. *Id.* at 6. Because

David Raybin acted as both trial and appellate counsel, Slimick supports her argument by framing the issue as an instance of the same attorney failing to pursue the same claim of juror misconduct—just at two different timepoints. *Id.* at 5. The State argues that Claim 5(c)(i) does not relate back to Slimick's initial pro se petition because it does not share a "common core of operative facts" with the claims in her initial petition. Docket No. 21, pp. 13–14.

Though a close call, this Court ultimately agrees with Slimick that Claim 5(c)(i) relates back to her initial pro se petition; however, Claim 5(c)(i) is inexcusably procedurally defaulted. Slimick failed to raise Claim 5(c)(i) before the Tennessee Court of Criminal Appeals on direct appeal, *Slimick v. State*, 2020 WL 1280801 at *3, and Tennessee law now bars proper exhaustion in the state courts. Tenn. Code Ann. § 40-30-106(g) ("[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . ."). Slimick also cannot demonstrate sufficient cause or prejudice to warrant excusal of this procedural default. As discussed above, Slimick must show that counsel's inadequacies worked to her "actual and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Based on the facts presented in the record, Slimick has not provided sufficient evidence to clear this high hurdle.

As a result, Slimick has inexcusably procedurally defaulted Claim 5(c)(i) and, therefore, cannot obtain relief on this claim.

### 3.  Claims 1–4 and Slimick's Request for an Evidentiary Hearing

As described above, Slimick argues that she is a "*Martinez*-postured habeas petitioner" entitled to an evidentiary hearing in light of her post-conviction counsel's ineffective assistance (Claims 1–4). Docket No. 12, p. 1.

Slimick acknowledges that *Shinn* "imputes post-conviction counsel's negligence onto a petitioner when counsel fails to develop the factual basis," but maintains that "*Shinn* should be distinguished where post-conviction counsel's misconduct goes beyond negligence to reckless or intentional disregard for their client's case." Docket No. 26, p. 10. She asserts that post-conviction counsel did, in fact, "go[] beyond negligence" by "inexplicably abandon[ing] [Slimick's] claims of ineffective assistance of trial counsel at the last minute and submitt[ing] an inept appellant's brief, mostly copied from trial/appellate counsel's inadequate brief on direct appeal." *Id.* Therefore, she maintains that she is entitled to an evidentiary hearing "to further develop the allegations outlined herein." Docket No. 12, p. 1.

This Court recognizes the impact of post-conviction counsel's decision to essentially submit appellate counsel's brief as their own to the post-conviction court. But despite the nature of these actions, Slimick does not cite—and the Court cannot find—any case law in support of her argument to distinguish *Shinn* here. Consequently, in light of the Supreme Court's constrictive intent in *Shinn* described *supra*, this Court declines to adopt Slimick's argument here. Slimick did not present her unexhausted claims in state court and therefore did not diligently pursue the factual development of those claims. Therefore, she must demonstrate that the claims as to which she seeks a hearing either "rely on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively available by th[e] [Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Id.* (quoting 28 U.S.C. §§ 2254(e)(2)(A)(i), (ii)). "If a prisoner can satisfy either of these exceptions, [she] must also show that further factfinding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted [her] of the crime charged." *Id.* (quoting 28 U.S.C. §

2254(e)(2)(B)). And even if all the statutory predicates of § 2254(e)(2) are satisfied, "a federal habeas court still is not required to hold a hearing or take any evidence." *Id.*

Here, the circumstances of Slimick's case do not fall within either of the two limited factual scenarios contemplated by 28 U.S.C. § 2254(e)(2)(A). She does not rely on a new, retroactively applicable rule of constitutional law. And the various factual predicates for counsel's alleged ineffectiveness are not newly discovered but rather have been known to Slimick for quite some time. Furthermore, Slimick has not shown that additional factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted her of the murder. 28 U.S.C. § 2254(e)(2)(B).

Accordingly, Slimick cannot obtain relief on Claims 1–4, and the Court recommends that Slimick's request for an evidentiary hearing be denied.

## IV.    CONCLUSION

For the reasons stated herein, the undersigned recommends that the petition for writ of habeas corpus be **DENIED**. Additionally, the undersigned recommends that Slimick's request for an evidentiary hearing be **DENIED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S. Ct. 899, 88 L. Ed. 2d 933 (1986).

_____

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**